UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JOSEPH JOLIVETTE                      CIVIL ACTION NO. 11-CV-1348

VERSUS                                JUDGE MELANCON

MICHAEL J. ASTRUE,                    MAGISTRATE JUDGE HANNA
COMMISSIONER OF SOCIAL SECURITY

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the determination be affirmed.

### Background and Commissioner's Findings

Joseph Jolivette is 35 years old.  He has a high school education; he can

read, write and do basic math. [Tr. 27-28, 123]  He has worked in the past as a

laborer for a construction company, a yard worker for an offshore company, and a

mailroom worker. [Tr. 28-29] He has a valid drivers license, and he drove himself

to the hearing discussed below. [Tr. 24]  He has alleged that he has been disabled

since April 15, 2007, due to problems described to be antisocial disorder and

impulse control disorder. [Tr. 4, 75, 118]   He filed applications for supplemental

security income benefits beginning in April, 2009. [Tr. 75-79] The application was

denied by DDS on concluding that Jolivette's condition prevented his performance

of some types of work, but he retained the capacity to perform other work. [Tr. 37] Jolivette sought a hearing before a Federal Administrative Law Judge.

After a hearing on Jolivette's claims on May 24, 2010,  a decision was issued by ALJ Robert Grant on July 7, 2010, denying the claim. [Tr. 8-15] Jolivette sought review of that decision by the Appeals Council, which refused to overturn the decision. [Tr. 1-4] Thus, the ALJ's denial of benefits to Jolivette is the "final" decision of the Commissioner.

On July 20, 2011, Joseph Jolivette filed the instant Complaint in this Court, seeking judicial review of the ALJ decision pursuant to 42 U.S.C. §405(g). [Rec. Doc. 1] He is represented by counsel on this appeal.

## ASSIGNMENT OF ERRORS

Jolivette asserts that his written waiver of the right to counsel at the ALJ hearing was invalid.  He alleges that the ALJ failed to explain "the manner in which an attorney can aid the claimant in proceedings before an ALJ."

Jolivette also  urges that because he suffered solely from severe non-exertional impairments, the Step Five burden shifted to the Commissioner to show that Jolivette could perform alternate employment, which Jolivette asserts the ALJ failed to do.  He argues that the ALJ mislead him at the hearing when he explained the role of the vocational expert.

## APPLICABLE  LEGAL STANDARDS  AND  SCOPE OF REVIEW

Any individual, after any final decision of the Commissioner of Social Security in which he was a party may obtain a review of the decision by a civil action. 42 U.S.C. 405(g). This Court's review of the Commissioner's decision that the claimant is not disabled is limited to determining whether that decision was supported by substantial evidence and whether the proper legal standards were applied in reaching that decision. *Alfred v. Barnhart*, 181 Fed. App'x 447, 449 (5th Cir. 2006); *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible, and any findings of fact by the Commissioner that are supported by substantial evidence are conclusive and must be affirmed. *Perez v. Barnhart*, 415 F.3d 457, 461(5th Cir. 2005); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

'Substantial evidence' is such relevant evidence as a responsible mind might accept to support a conclusion; it is more than a mere scintilla and less than a preponderance. *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Boyd v. Apfel,* 239 F.3d at 704. Finding substantial evidence does not involve a search of the record for isolated bits of evidence that support the Commissioner's decision; instead, the entire

record must be scrutinized as a whole.  *Singletary v. Bowen*, 798 F.2d at 823.  In applying this standard, the court may not re-weigh the evidence in the record, try the issues *de novo*,  or substitute its judgment for that of the Commissioner, even if the evidence weighs against the Commissioner's decision.  *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135; *Newton v. Apfel*, 209 F.3d 448, 452(5th Cir. 2000).   To determine whether the decision to deny social security benefits is supported by substantial evidence, the court weighs the following factors: (1) objective medical facts; (2) diagnoses and opinions from treating and examining physicians; (3) plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) plaintiff's age, educational background, and work history. 42 U.S.C.A. §405; *Martinez v. Chater*, 64 F.3d 172, 174(5th Cir. 1995).  Any conflicts in the evidence regarding the claimant's alleged disability are to be resolved by the administrative law judge, not the reviewing court. *Newton v. Apfel*, 209 F.3d 448, 452(5th Cir. 2000).

*Disability* is defined in the Social Security regulations as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).  *Substantial gainful activity* is defined as work activity

involving significant physical or mental abilities for pay or profit. 20 C.F.R. §404.1572(a)-(b).

In determining whether a claimant is disabled, the Commissioner uses a five-step sequential analysis, which requires analysis of the following:  (1) whether the claimant is currently engaged in substantial gainful activity (i.e., whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing  past relevant work (i.e., whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).  See, also, 20 C.F.R. § 404.1520.  "Determining whether a claimant is disabled because of a mental condition under the above sequential process can be a difficult task." *Singletary v. Bowen*, 798 F.2d 818, 820 (5th Cir. 1986).

If the Commissioner determines that the claimant is disabled at any step, the analysis ends.  20 C.F.R. § 404.1520(a)(4). If the Commissioner cannot make a determination at any step, he goes on to the next step.  20 C.F.R. § 404.1520(a)(4). When assessing a claim for disability benefits in the third step, the medical evidence

of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. *Sullivan v. Zebley*, 493 U.S. 521, 525, 110 S.Ct. 885, 107 L.Ed.2d 967(1990).  If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, the Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. §423(d)(2)(B).   The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531, 110 S.Ct. 885.  It is the claimant's burden to prove at step three that his impairment or combination of impairments matches or is equivalent to a listed impairment. *Id.* at 530-31.  For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of the specified criteria, no matter how severe, does not qualify. *Id.*  Ultimately, the question of equivalence is an issue  reserved for the Commissioner. *Spellman v. Shalala*, 1 F.3d 357, 364(5th Cir. 1993).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). This is a determination of the most the claimant can still do despite his physical and mental

limitations and is based on all relevant evidence in the claimant's record. 20 CFR §
404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step
to determine if the claimant can still do his past relevant work, and at the fifth step,
it is used to determine whether the claimant can adjust to any other type of work. 20
CFR § 404.1520(e).  When a claimant's residual functional capacity is not sufficient
to permit him to continue his former work, then his age, education, and work
experience must be considered in evaluating whether he is capable of performing any
other work.  *Boyd v. Apfel,* 239 F.3d 698, 705 (5th Cir. 2001); 20 C.F.R. § 404.1520.
The testimony of a vocational expert is valuable in this regard, as such expert "is
familiar with the specific requirements of a particular occupation, including working
conditions and the attributes and skills needed."  *Fields v. Bowen*, 805 F.2d 1168,
1170(5th Cir. 1986); *see also Vaughan v. Shalala*, 58 F.3d 129, 132(5th Cir. 1995).

The claimant bears the burden of proof on the first four steps, and then the
burden shifts to the Commissioner on the fifth step to show that the claimant can
perform  other substantial work in the national economy.   If the Commissioner
makes the necessary showing at step five, the burden shifts back to the claimant to
rebut this finding. *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309
F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

When a mental disability claim is made, such as bipolar disorder or major depressive disorder, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim.  Essentially, this procedure  substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings.  The regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, §404.1520(a)(e) provides that the ALJ must document his application of this technique to the claimant's mental impairments. *Satterwhite v. Barnhart*, 44 Fed. Appx. 652(5th Cir. 2002)(unpublished).

*The Effect of Drug/Alcohol Abuse on the Analysis:*

In 1996, Congress enacted a statute which eliminates drug and alcohol dependency as criteria for awarding disability benefits.  Drug abuse and alcoholism are no longer considered disabling, regardless of how much those impairments interfere with an individual's ability to function.  Specifically, the regulation provides:

> An individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would(but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled. 42 U.S.C. §423(d)(2)(C).

-8-

On considering the disability claim of an individual who abuses drugs or alcohol, the agency or the reviewing court must determine whether the claimant is disabled, using all the rules of determining disability that apply to all claimants. 20 CFR §§404.1535(a), 416.935(a). Next, the agency(and court) must determine whether the claimant would still be disabled if he stopped using drugs or alcohol. 20 CFR §§404.1535(b)(1), 416.935(b)(1). If the claimant would remain disabled if he stopped using alcohol or drugs, he would be found eligible for benefits. 20 CFR §§404.1535(b)(2)(ii), 416.935(b)(2)(ii). However, if the claimant would not remain disabled if he stopped using drugs or alcohol, he will be found ineligible for benefits. 20 CFR §§404.1535(b)(2)(I), 416.935(b)(2)(i).

Courts have held that the burden is upon the claimant to show that he would be disabled even if he stopped abusing drugs or alcohol, and the Fifth Circuit holds that a claimant who uses drugs or alcohol has the burden of proving that his drug or alcohol problem is not "material" to his disability, i.e., that he would still be disabled even if he stopped using drugs or alcohol. *Brown v. Apfel*, 192 F. 3d 492, 499(5th Cir. 1999).

*Non-Exertional Impairments:*

Impairments that remain constant at all levels of exertion form an important part of residual functional capacity. These impairments are called non-exertional

impairments, because the claimant suffers these impairments constantly, whether or not he exerts himself.  Allergies are non-exertional impairments, and may be severe. Intolerance to stress may also be a non-exertional impairment.  Side effects from medications have also been included in consideration as non-exertional impairments. Pain can be a non-exertional impairment when it exists whether or not the claimant is exerting himself in physical activities.

## ANALYSIS AND DISCUSSION

*The Administrative Record:*

The claimant's employment record as described above appears in the record in several places, including the testimony of Joseph Jolivette. The medical records in this case include historical information provided by the claimant to his treatment providers.  Joseph Jolivette has disclosed a history of drug use since age 13, including crack cocaine. [Tr.  ] He was admitted to a local emergency room by police on May 22, 2008, after he ingested crack cocaine. [Tr. 165-167] From December, 2008 to Easter, 2009, Jolivette was subject to house arrest as a result of a drug charge. [Tr. 154, 228, 232] This history influenced diagnoses recorded by Jolivette's treatment providers at Tyler Mental Health Center from February 16, 2009 through April, 2009 to include a primary diagnosis of polysubstance dependence, with secondary diagnoses of malingering, impulsive  disorder, and anti-social personality disorder.

[Tr. 172, 191, 217, 221, 238-39] Mental status exam notes indicate that Jolivette exhibited normal cognition and memory and average/above average intelligence. [Tr. 190]

Also a part of the administrative record are reports of the psychiatric review/evaluation performed by Dr. Paul Cherry. [Tr. 198-215] The report includes the detailed 'Paragraph B' Rating of Functional Limitations, indicating that relative to social functioning, activities of daily living and concentration/persistence/pace, the claimant had only moderate limitations.  No episodes of decompensation were noted. [Tr. 208] Consultant notes referenced the claimant to be without major problems or complaints as of April 6, 2009, and stable with average mood in May, 2009. [Tr. 210] Mental Residual Functional Capacity Assessment conclusions noted only one marked limitation-the claimant's inability to interact appropriately with the general public. [Tr. 213] The consultant elaborated on the claimant's abilities/limitations as follows:

> Claimant has a history of antisocial personality disorder and impulse control issues, but his symptoms now seem stable enough that he could perform simple, basic tasks in a setting wherein interpersonal contact is incidental to tasks performed. [Tr. 214]

*The Administrative Hearing:*

At the administrative hearing, all medical records and other documents were received into evidence without objection. The hearing was commenced on May 24,

2010 before ALJ Robert Grant.   The hearing was conducted from Alexandria, Louisiana, with the plaintiff appearing by video conferencing in Lafayette, Louisiana. Joseph Jolivette appeared without legal representation, though he had previously had assistance from a non-attorney representative appointed by the SSA[1]. [Tr. 36] Prior to his testimony, Jolivette executed the written waiver of legal representation discussed above, and he engaged in the exchange with the hearing officer cited above relative to his waiver.

In response to questions from the ALJ, Jolivette provided information about his age (32 at the time), marital status (single), and his current medical treatment involving monthly visits at Tyler Mental Health Clinic, where he receives counseling from an individual he could not name. [Tr. 24]   He listed his medications to include Depakote, Risperdol, and Sinequan, which cause him to feel tired and drowsy. [Tr. 24-25]   When asked to describe his symptoms, Jolivette indicated that he gets paranoid around people and does not like to be around people.  He indicated that he leaves home only when he must, about 3-4 times a week.  He has a hard time focusing and concentrating and remembering things. [Tr. 25] He lives with his parents, and his father takes care of everything for him. [Tr. 26] When asked about his impulse control

---

[1]The representative withdrew by letter April 13, 2010. [Tr. 71]

disorder, Jolivette explained that he does things without thinking about them first, like breaking things when he becomes angry.  Since taking prescribed medicines, he has been controlling his temper better. [Tr. 26] Jolivette does no chores around the house, relying on his father to do dishes and laundry. [Tr. 27] He spends a typical day lying down and watching TV all day, too tired to do anything else. [Tr. 27] He acknowledged a period when he had alcohol and drug issues, and he could not recall when he last drank or used drugs. [Tr. 27]

Thomas LaFosse testified as a vocational expert.  He reviewed and summarized the claimant's employment records and testimony regarding work history.  Based on Jolivette's description of the mail handling position noted in the record, LaFosse used the position of material handler as a comparative, a heavy-duty position. Records indicating that the claimant worked as a utility worker in a department store were interpreted as a janitor clean-up position, which is considered medium level, per LaFosse.  The claimant's work as a laborer in the yard of an offshore company was considered to be heavy duty work.  Work done by Jolivette as a roustabout  was considered very heavy.  Industrial cleaning jobs held by the claimant through a temporary agency were considered  medium level, and the reported work by Jolivette for his uncle's construction company was considered to be very heavy level work.

At the time of his testimony, LaFosse had no information regarding the claimant's educational level.[Tr. 29-30]

Based on the information contained in the record and testimony presented at the hearing regarding Joseph Jolivette, the ALJ posed hypothetical questions to LaFosse.  He asked the expert to assume the education and work experience of the claimant, without exertional limitations, but the claimant would be limited to simple, routine and repetitive tasks with one to two step instructions and only frequent{sic} interactions with the public. [Tr. 31] The expert opined that an individual with those limitations could perform the claimant's past work in the mailroom as described by Jolivette.  He could also work as a construction laborer as described by the claimant. [Tr. 31] The expert further responded that with the ALJ-added vocational limitations, there are other jobs in the national and regional economy such a person could perform, including most of the unskilled jobs in the U.S. economy.  He specifically named the jobs of vehicle cleaner (unskilled/medium- about 200,000 positions; unskilled/light- 73,000 positions), hand packer/packager (unskilled/medium-242,000 positions; unskilled/light-468,000 positions). [Tr.31-32]

In response to the testimony by the vocational expert, Joseph Jolivette did not ask questions on cross-examination, but spoke up to urge that he does not have the physical strength to do the jobs referenced by the expert:

-14-

CLMT: I understand what you're saying, I hear what you're talking about, but all that is not really possible when I'm taking this medication. All that labor work I hear you saying, two-hundred some thousand, seventy-some thousand. I don't have physical strength to do all of that. [Tr. 32]

The hearing closed with the ALJ assuring the claimant that he would take Jolivette's comments into consideration and that he would review all medical records and testimony in the record before publishing a decision. [Tr. 32]

*The Determination of the ALJ:*

The record demonstrates that the ALJ followed the requisite five step sequence in analyzing the claims of Joseph Jolivette. In this case, the Commissioner found, at step one, that Jolivette had not engaged in substantial gainful activity since April 16, 2009, the application date. At step two, the claimant was found to have severe impairments of antisocial personality disorder and impulse control disorder, which cause more than minimal limitations in his ability to work. At step three, the ALJ found that Jolivette does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1,(20 CFR 416.920(d), 416.925 and 416.926). In making that finding, the ALJ considered the "paragraph B" criteria to find the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation of extended duration so as to satisfy the

-15-

"paragraph B" criteria.  The ALJ further found that the evidence fails to establish the presence of the "paragraph C" criteria. [Tr. 11]

The ALJ acknowledged use of the "paragraph B" criteria at steps 2 and 3 to rate the severity of mental impairments and the more detailed assessment required at steps 4 and 5.  Before proceeding to step four, the ALJ found that Joseph Jolivette has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with specified nonexertional limitations.  The claimant is limited to work that has simple, routine, and repetitive tasks; with one or two-step instructions; in a work environment that is free of any fast-paced production requirements; that requires only simple, work-related decisions with few, if any, work place changes; and, only frequent {sic} interaction with the public.  In arriving at the RFC, the ALJ considered the entire record and followed the requisite two-step process to determine (1) whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms and if so, (2) to evaluate the intensity, persistence and limiting effects of the symptoms to determine the extent to which they limit his functioning.  The ALJ found that Jolivette's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the claimant's statements concerning the intensity, persistence and limiting effects of the symptoms are not credible to the extent they

are inconsistent with the RFC. [Tr. 13]   These findings are supported by substantial evidence in the record, including opinion evidence, as cited in some detail in the Decision.

At step four, the ALJ found that Joseph Jolivette is unable to perform any past relevant work, based on testimony from the vocational expert that the claimant's past relevant work as a materials handler/mailroom clerk was a semiskilled position, which he can no longer do based on the RFC.  Since the claimant was found to be unable to do any past relevant work, or has no past relevant work, the ALJ properly proceeded to step five.  At that step, consideration is given to whether the claimant is able to do any other work, considering his RFC, age, education and work experience.  In this case, the ALJ found that Jolivette's ability to perform work at all exertional levels has been compromised by nonexertional limitations.  To determine the extent to which those limitations erode the occupational base of unskilled work at all exertional levels, the record demonstrates that the ALJ  posed appropriate hypothetical questions to the vocational expert witness to establish that work exists in significant numbers in the national economy that the claimant can do, given his RFC, age, education and work experience, including specific references to Jolivette's limitations as described in the RFC.  The testimony given by the vocational expert presented sufficient evidence and statistics to meet the step five requirements, and

based on that testimony, the ALJ found that Jolivette is capable of making a successful adjustment to other work existing in significant numbers in the national economy, justifying a finding of "not disabled."  The Fifth Circuit has held that an ALJ need only incorporate into the hypothetical questions posed to a vocational expert those claimed disabilities that are supported by the evidence and recognized by the ALJ.  *Masterson v. Barnhart*, 309 F.3d 267, 273(5th Cir. 2002); *Bowling v. Shalala*, 36 F.3d 431, 436(5th Cir. 1994).  In applying this standard, the ALJ's hypothetical question adequately incorporated the limitations described in the RFC.

*Discussion:*

In calling for reversal of the ALJ's determination that he is not disabled, Jolivette "cries foul" to assert that (1)the ALJ mislead him during the hearing to suggest that the vocational expert would only offer opinions about his work history, and (2)the ALJ did not adequately inform him regarding his right to counsel and the import of his waiver of counsel during the hearing.  In brief, the claimant urges that

> it was reasonable for the mentally impaired Plaintiff to conclude that the vocational expert would have no advantage, since Plaintiff was equally aware of his own work history.  It was also reasonable, therefore, for the unrepresented, mentally impaired Plaintiff to conclude, based upon the ALJ's explanation, that Mr. Lafosse's testimony would, at best, be innocuous. [Rec. Doc. 11, p. 7]

Jolivette argues that the alleged misleading explanation by the ALJ "influenced his decision to proceed without counsel," invalidating his written waiver of counsel. While the record documents Jolivette's psychiatric/mental limitations, it also confirms his ability to understand and comprehend information on at least average, and perhaps above-average levels; further  there is no indication in the record that Jolivette was influenced in any way by the ALJ regarding his clear decision to proceed without counsel.  He expressed no uncertainty or reluctance, and the colloquey between the claimant and the ALJ contains no suggestion that the ALJ sought to influence the claimant in any way regarding legal representation, unlike the case of *Johnson v. Astrue*, 08-30986, 2009 WL 1181607(5th Cir. May 1, 2009),cited by Jolivette.

A claimant has a statutory right to counsel at a Social Security hearing, but he may waive that right if given sufficient information to enable him to decide intelligently whether to retain counsel or proceed *pro se.*  42 U.S.C. §406.  'Sufficient information' includes explanations of the possibility of free counsel, a contingency agreement and the limitation on attorney's fees to 25% of past due benefits awarded. *Clark v. Schweiker*, 652 F. 2d 399, 403-04(5th Cir. 1981); *Castillo v. Barnhart*, 325 F.3d 550(5th Cir. 2003).  Mere lack of counsel will not overturn the ALJ's decision.

The claimant must show that prejudice or unfairness resulted from his lack of counsel.  *Clark*, 652 F.2d at 404; *Castillo*, 325 F.3d at 552.

Before the start of the hearing, Jolivette received notice by mail of the manner in which the hearing would be conducted. [Tr. 51-56]  He was informed that a vocational expert would appear at the hearing by video teleconference and that he would be able to see, hear, and speak to the expert during the hearing. He was also informed that he or his representative could submit documents, and he could present and question witnesses at the hearing. [Tr. 54-55] On the hearing date, Jolivette signed a voluntary Waiver of Representation, electing to proceed without counsel and acknowledging that he had received a list of organizations that provide legal services prior to receiving the Notice of Hearing. [Tr. 73] On commencement of the hearing, Jolivette was questioned by the ALJ regarding his prior representation, and he indicated that he thought the former non-attorney representative had "quit on" him. [Tr. 21] He confirmed he had not sought legal counsel since that time.  In response, the ALJ had the following exchange with the claimant:

> ALJ: Because you don't have an attorney with you there's a couple things I need to make sure you understand.  I need to make sure you understand that you have a right to have an attorney with you if you want one.  I need to explain to you that most attorneys don't require any money up front.  They generally take a percentage of whatever they can recover for you.  So if you think you can't afford an attorney, you probably still can get one.  And third, if you'd like some additional time

to look for an attorney, I'd be happy to reschedule the hearing to let you go do that.  So having heard all that, do you want to go forward today, or do you need some additional time?

CLMT: We can go forward.

ALJ: Because you don't have an attorney there's some things I need to read to you.  So please bear with me, okay.  The primary issue before the court today is whether or not you are disabled as defined by the relevant provisions in the Social Security Act.  If I find that you are disabled I must also determine the date your disability began.  In order for me to find you disabled you must have a medically determinable, severe physical or mental impairment that keeps you from doing not only your past work, but any other appropriate work.  In order to be medically determinable you [INAUDIBLE] must be established by medical evidence including clinical diagnostic and [INAUDIBLE] finding, not just your testimony alone.  I will also consider your age, your education and any relevant past work.  Additionally, your impairment must last, or be expected to last, at least 12 months or be terminal.  Do you have any questions about all that?

CLMT: No, sir.     [Tr. 22-23]

On this record, it is the finding of the undersigned that Joseph Jolivette was given sufficient information before and at the hearing to enable him to decide intelligently whether to retain counsel or proceed *pro se* per the directive of  42 U.S.C. §406.  Even at the last minute, Jolivette was offered and declined the option to postpone the hearing to allow him to engage legal counsel.  His declaration that the hearing "can  go forward" was clear and unreserved.  Further, the claimant has failed to show that prejudice or unfairness resulted from his election to proceed without counsel, which is his burden.  Thus, the court finds Jolivette's waiver of counsel to be valid.

-21-

Jolivette further asserts that he was denied the opportunity to cross examine the expert witness, depriving him of his due process right to be heard in a meaningful manner.  The record transcript of the hearing confirms that Jolivette did not receive a clear invitation or question regarding his right or intention to cross-examine the expert witness at the closing of questioning by the ALJ.  Yet, at the close of the expert's testimony, the claimant actively expressed his disagreement with the VE's findings, clearly articulating his position that he could not physically withstand the referenced alternate employment. [Tr. 32] His comments were meaningful and responsive to the testimony of the VE; he was not interrupted or silenced by the ALJ, and the ALJ confirmed that his position had been understood and would be considered in the decision making process.

It is well-settled that claimants enjoy due process guarantees, not the least of which is the right to cross-examine and subpoena the individuals who submit reports, including healthcare providers. *Tanner v. Secretary of Health and Human Services*, 932 F.2d 1110, 1112(5th Cir. 1991); *Wallace v. Bowen*, 869 F.2d 187, 192 (3d Cir.l 1989) ("...an opportunity for cross-examination is an element of fundamental fairness of the hearing to which a claimant is entitled...").  Jolivette has not challenged the reports of his healthcare providers and evaluators which were entered into evidence. His only challenge is to the live testimony of the VE, which he articulated at the

-22-

hearing.  This was not the case of the ALJ receiving and relying on the post-hearing written report of an expert, without live testimony, as was the case in *Tanner v. Secretary of Health and Human Services*, 932 F.2d 1110(5th Cir. 1991), cited by the claimant.

The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Matthews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).  The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation; it is not a technical conception with a fixed content unrelated to time, place, and circumstances. *Id.* at 334.  *Matthews* calls for a balancing to weigh the private interests affected by the official action, the risk of erroneous deprivation through the existing procedure, and the government's interest in minimizing its administrative and financial burdens. *Matthews*, 424 U.S. at 334-35.  Even in criminal cases where evidentiary errors have occurred, due process requires nothing more than "a fundamentally fair" procedure. *Burnett v. Collins*, 982 F.2d 922, 928 n. 8(5th Cir. 1993).  On the record of the instant case, the undersigned finds that Jolivette was neither misled nor denied the opportunity to be heard in a meaningful manner regarding the expert's testimony, and he, in fact, articulated his disagreement with the testimony in clear language accepted for consideration by the ALJ.

-23-

It is the duty of the ALJ to develop the facts relative to a claim for benefits fully and fairly. *Kane v. Heckler*, 731 F.2d 1216, 1219(5th Cir. 1984); 20 CFR 410.640(2000). Moreover, the ALJ's "basic obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with the hearing procedures appears before him." *Id*. The ALJ must "scrupulously and conscientiously probe into, inquire, of and explore for all the relevant facts." *Id*. In *Kane,* the ALJ asked the claimant only one question, and the hearing lasted five minutes. In the instant case, as described above, the claimant was questioned in some detail by the ALJ, including questions to elicit details about his education, work history, symptoms and alleged limitations and his daily activities. Jolivette was responsive to questions and forthcoming with information. This record is obviously more expansive than that developed in *Kane*, and the ALJ fulfilled his duties as set forth in *Kane* to develop the relevant facts so that he could fully and fairly evaluate the case. Reversal for failure to adequately develop the record by the ALJ is only warranted on a showing of prejudice by the Plaintiff by demonstrating what specific evidence could have and would have been presented sufficient to alter the outcome of the hearing. *Id.* at 1220. That a competent lawyer may have called other witnesses, engaged experts or questioned Jolivette to better detail his claims, and that a competent attorney may have vigorously cross-examined the expert witness do not

change the facts established in the record, and Jolivette, who clearly elected to proceed without counsel, has not demonstrated what specific evidence would have/could have altered the outcome, as is his burden.

### CONCLUSION AND RECOMMENDATION

It is well-established that "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176, *citing Moore v. Sullivan*, 919 F.2d 901, 905(5th Cir. 1990). As discussed above, this Court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021(5th Cir. 1990).   In the instant case, the record demonstrates that the proper legal standards were applied to consideration of Joseph Jolivette's claims, and the undersigned cannot conclude that the ALJ failed to base his determination on substantial evidence, that is evidence which is more than a mere scintilla and less than a preponderance.  *Boyd v. Apfel,* 239 F.3d  at 704.

Applying the appropriate review standard to the record of the instant case,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be affirmed.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of

this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 15th day of November, 2012.


_____
Patrick J. Hanna
United States Magistrate Judge


-26-